IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Philip A. Brimmer

Civil Case No. 09-cv-00038-PAB-BNB

RORY WAGNER and
JOANNE WAGNER,

    Plaintiffs,

v.

UNIVERSAL FINANCIAL GROUP, INC.,

    Defendant.
_____

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
_____

This matter is before the Court on defendant Universal Financial Group, Inc.'s motion for summary judgment [Docket No. 19]. The motion is fully briefed and ripe for disposition. For the reasons explained below, the motion is granted.

**I. BACKGROUND**[1]

This unfortunate story begins with the Wagners investing a substantial sum of money in a real estate venture run by Calvin Pryor. Mr. Wagner met Mr. Pryor at an investment seminar in Westminster, Colorado. Def.'s Mot. for Summ. J. [Docket No. 19] ("Def.'s Mot."), Ex. A at 31:18-24. In early 2006, after several additional meetings between the two, Mr. Wagner paid Mr. Pryor $150,000 for a stake in an apartment complex operation from which Mr. Wagner was told he would receive income of

---

[1] The parties' briefs are often unclear as to precisely which facts are in dispute. However, neither party points to any serious factual disagreements, and Universal's arguments in support of its motion for summary judgment are essentially legal ones. Having reviewed the summary judgment record, I present what I deem to be the undisputed background facts.

$55,000 to $59,000 per month for at least a year. *Id.* at 56:23-64:6. These payments never materialized. *Id.* at 67:11-24.

In January 2007, Mr. Pryor's attorney, Todd Doss, contacted the Wagners about a purported satisfaction of the debts Mr. Pryor owed them. *Id.*, Ex. A at Depo. Ex. 1. Mr. Doss represented that a trust belonging to Mr. Pryor would finance this payoff. *Id.* Because of "wording within Mr. Pryor's trust," the Wagners would be required to refinance their home and a related home equity line of credit into one debt that would then be paid from the trust's funds. *Id.* The Wagners were told to work with Eureka McKinney at Universal Financial Group, Inc. ("Universal") on the refinancing process. *Id.*

Ms. McKinney was an entry level employee of Universal, hired in August 2006. *Id.*, Aff. of James Savino ("Savino Aff.") ¶ 2. Ms. McKinney was also working with, and eventually married, Mr. Pryor. *Id.*, Ex. A at Depo. Ex. 33; Pls.' Resp. to Def.'s Mot. for Summ. J. [Docket No. 22] ("Pls.' Resp."), Ex. 1 ¶ 23. Neither Universal nor the Wagners knew of this relationship at the time of the refinancing. *See* Def.'s Mot., Savino Aff. ¶ 3. During Ms. McKinney's initial conversation with the Wagners, she allegedly confirmed what Mr. Doss had represented, that the Pryor trust would pay off the refinance loan as soon as it was closed. Pls.' Resp., Ex. 1 ¶ 5. The Wagners claim that Ms. McKinney also told them that, after closing, they were to wire $15,000 from the loan proceeds directly to her as payment for the trustee's services. *Id.* ¶ 15. The Wagners acknowledge that neither of these terms – the payoff from the trust or the

2

$15,000 fee – were put into writing. Def.'s Mot., Ex. A at 161:11-15; 199:24-200:14; *see also id.*, Savino Aff. ¶ 4.

The refinance loan closed as scheduled in late January 2007. Pls.' Resp., Ex. 1 ¶ 14. The Wagners do not dispute that the loan documents accurately conveyed the basic terms of the loan, e.g., interest rate, finance charge, and payment totals. *See* Def.'s Mot., Ex. A at 195:5-199:6. The loan, made for $291,000, paid the outstanding debts on the property, the closing costs, and the $15,000 "trustee fee." Pls.' Resp., Ex. 1 ¶¶ 16, 28. However, despite the Wagners' repeated communications with an employee at the company ostensibly scheduled to make the payoff from the Pryor trust, an employee who the Wagners now believe was actually Ms. McKinney posing as "Angee Price," the payoff never occurred. *Id.* ¶ 21. The Wagners continue to pay on the Universal loan, the terms of which – in particular the 7.875% adjustable interest rate – are less favorable than the terms of the loans that were refinanced. *Id.* ¶ 32.

The Wagners eventually brought suit against Universal in Colorado state court. Compl. [Docket No. 1-3]. Their complaint asserts seven state law claims for relief: violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 *et seq.*; violation of Colorado's statute banning unconscionable mortgage practices, *id.* § 38-40-105; fraud; misrepresentation; negligent hiring (of Ms. McKinney); negligent training and supervision (again of Ms. McKinney); and basic negligence. *Id.* Universal removed the case to this Court on the basis of diversity jurisdiction, *see* Notice of Removal [Docket No. 1], and shortly thereafter moved for summary judgment on all claims.

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56(c) when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III. ANALYSIS

This case is before me on an exercise of diversity jurisdiction and thus I apply the choice of law rules of the forum state – Colorado – to determine what substantive law controls the disposition of the matter. *Electrical Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074, 1083 (10th Cir. 1999). The parties do not dispute that Colorado's substantive law applies. As the bulk of the conduct and the sting of the injury occurred in Colorado, I concur with the parties' assessment. *In re AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509 (Colo. 2007) (holding that, under Colorado's choice of

law analysis, the state with the most significant relationship to the occurrence and the parties for any particular issue supplies the relevant substantive law).

Universal advances two arguments in its motion. First, it contends that the Wagners' claims for relief are barred by the Colorado credit agreement statute of frauds. Def.'s Mot. at 1, 7-11. Second, it claims that the Wagners' cause of action for negligence, to the extent not barred by the statute of frauds, fails for lack of a legal duty. *Id.* at 1, 11-13. I consider these arguments in turn.

### A. Colorado Credit Agreement Statute of Frauds

In an effort to discourage lender liability litigation for breaches of alleged oral commitments to lend, Colorado enacted its credit agreement statute of frauds, which provides:

> Notwithstanding any statutory or case law to the contrary, . . . no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought.

Colo. Rev. Stat. § 38-10-124(2); *see also Schoen v. Morris*, 15 P.3d 1094, 1098 (Colo. 2000) (describing legislative history). The statute was intended "to impose a broad ban on claims arising from oral representations made by financial institutions," *Schoen*, 15 P.3d at 1099, and did so by "effectuat[ing] a bar to any action or claim *relating to* a credit agreement," *Norwest Bank Lakewood, Nat'l Ass'n v. GCC P'ship*, 886 P.2d 299, 302 (Colo. App. 1994) (emphasis in original). The import of the statute is clear; it "renders representations, warranties, or omissions in connection with credit agreements inoperative unless they are reduced to writing." *Norwest*, 886 P.2d at 302.

5

There is no dispute that the Wagners, having sought and obtained a loan from Universal, are "debtors" under the statute. Colo. Rev. Stat. § 38-10-124(1)(c) ("'Debtor' means a person who or entity which obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor."). Nor is it disputed that the $291,000 loan amount exceeds the statute's $25,000 threshold. Although perhaps not obvious, the statute's definition of "credit agreement" also applies to the oral representations of the terms, such as the payoff by the trust and the $15,000 trustee fee, purportedly negotiated with Ms. McKinney. *Id.* § 38-10-124(1)(a)(I), (III) ("'Credit agreement' means . . . (I) [a] contract, promise, undertaking, offer, or commitment to lend, borrow, repay, or forbear repayment of money, to otherwise extend or receive credit, or to make any other financial accommodation [and] . . . (III) [a]ny representations and warranties made or omissions in connection with the negotiation, execution, administration, or performance of, or collection of sums due under, any of the credit agreements defined in subparagraph[ ] (I) . . . ."). The Wagners challenge only two aspects of the statute: whether Universal is the type of institution entitled to the statute's protection and, if so, whether the statute applies to the particular claims at issue in this litigation.

### 1. Is Universal a "Creditor"?

The statute of frauds applies to actions between debtors and creditors. A "creditor" is defined as "a financial institution which offers to extend, is asked to extend, or extends credit under a credit agreement with a debtor." *Id.* § 38-10-124(1)(b). A "financial institution," in turn, "means a bank, savings and loan association, savings bank, industrial bank, credit union, or mortgage or finance company." *Id.* § 38-10-124(1)(d). Mortgage companies – those that make mortgage loans – are expressly

covered by this definition. *See also Fisher v. 1st Consumers Funding, Inc.*, 160 P.3d 321, 323-24 (Colo. App. 2007). On the other hand, mortgage *brokers* – companies that simply arrange loans rather than actually offering credit – are not "financial institutions" under the statute. *Id.*

The Wagners contend that Universal was acting as a mortgage broker during the refinancing transaction. Universal is both a "mortgage brokerage firm" and a "full service mortgage banker." Pls.' Resp., Ex. 8; *see also id.*, Ex. 7 (noting that Universal is registered mortgage broker in Missouri). The Wagners point out that the parties signed a "Loan Brokerage Agreement" in connection with the loan, and also note that Universal retained the ability to broker the loan, i.e., have the loan funded by a third party, up through the date of closing. *Id.*, Ex. 5 at 162:8-163:7; Ex. 9. However, while Universal may have had the *right* to broker the Wagners' loan, the undisputed evidence shows that it did not. Rather, Universal provided its own funds for the refinancing transaction, *id.*, Ex. 5 at 160:23-161:8, as evidenced by the fact that Universal is listed as the lender on all of the loan closing documents, Def.'s Mot., Ex. A at Depo Exs. 18, 23, 24. As Universal "offer[ed] to extend" and did "extend[ ] credit" to the Wagners, it is the type of financial institution creditor protected under the statute. Colo. Rev. Stat. § 38-10-124(1)(b); *compare Fisher*, 160 P.3d at 324 (finding that mortgage broker was not a financial institution or creditor where it "arranged a mortgage loan from" a third party and where "[t]here [wa]s no evidence in the record that [the broker] ever offered to extend or actually extended credit").

### *2. Does the Statute of Frauds Extend to all of the Wagners' Claims?*

The Wagners next contend that, even if Universal is a "creditor" covered by the statute of frauds, (a) their statutory claims for violation of the Colorado Consumer Protection Act and the Colorado statute banning unconscionable mortgage practices and (b) their common law claims for negligent hiring and negligent training and supervision still survive.[2] Pls.' Resp. 10-17. They assert different theories for the statutory and common law claims.

#### a. Statutory Claims

The Wagners' primary argument is that the Consumer Protection Act and the unconscionable mortgage practices statute are in "irreconcilable conflict" with the statute of frauds. *Id.* at 13-15. The unconscionable mortgage practice statute prohibits, *inter alia*, "mak[ing] a false promise or misrepresentation . . . to entice either a borrower or a creditor to enter into a mortgage agreement." Colo. Rev. Stat. § 38-40-105(1)(b). On its face, this would seem to apply to Ms. McKinney's alleged misrepresentations concerning the trust payoff. Moreover, the unconscionable mortgage practices statute incorporates its prohibited practices as "deceptive trade practice[s]" under the Consumer Protection Act, Colo. Rev. Stat. § 38-40-105(3), suggesting that statute might be implicated as well. As these statutes permit relief, the Wagners' argument goes, they directly conflict with, and thus must be reconciled with, the statute of frauds' bar of that same relief.

---

[2] The Wagners appear to concede that if Universal is a financial institution creditor, their claims for common law fraud and common law misrepresentation are barred.

8

The Wagners contend that because these substantive consumer protection statutes are more recent[3] and more specific than the procedural statute of frauds, the consumer protection statutes prevail as an exception to the statute of frauds' general bar. Pls.' Resp. at 10-15. If these laws are in fact in irreconcilable conflict, the Wagners correctly identify the interpretive tools to be used to establish which statutes control. *See Jenkins v. Panama Canal Ry. Co.*, 208 P.3d 238, 241-42 (Colo. 2009) ("The General Assembly has prescribed two rules for deciding which of two irreconcilable statutes governs. First, the specific provision prevails over the general provision. . . . Second, the statute with the more recent effective date prevails." (citing Colo. Rev. Stat. §§ 2-4-205, -206)). However, as a threshold matter "[a] court's primary objective in interpreting assertedly conflicting statutes is to give effect to the legislative intent." *Lininger v. City of Sheridan*, 648 P.2d 1097, 1099 (Colo. App. 1982) (citing *State Highway Comm'n v. Haase*, 537 P.2d 300 (Colo. 1975)). "To discern such intent, we first look to the statutory language, according terms their plain and ordinary meaning. When the plain language is clear, we will not rely on interpretive rules of statutory construction." *People v. Smith*, 971 P.2d 1056, 1058 (Colo. 1999). In other words, when determining which of the conflicting statutes takes precedence, the court

---

[3] The Consumer Protection Act was enacted in 1969, well before the 1989 enactment of the credit agreement statute of frauds. *See* Note, *The Colorado Consumer Protection Act; Panacea or Pandora's Box*, 70 Den. U. L. Rev. 141 n.3 (1992); Stephanie J. Shafer, *Limiting Lender Liability Through the Statute of Frauds*, 18 Colo. Law. 1725 (Sept. 1989). However, because the unconscionable mortgage practices statute, passed in 2002, essentially amended the Consumer Protection Act to include the specified mortgage practices as deceptive trade practices, the Wagners appear to be arguing that the 2002 date should be used as the relevant date for both consumer protection statutes. Because the statute of frauds prevails regardless of enactment dates, I assume without deciding that this position is correct.

should first examine the statutes' "plain language" and only if that language fails to present "a clear and unambiguous answer" should the court "resort to additional rules of statutory construction to resolve th[e] issue." *Martin v. People*, 27 P.3d 846, 860 (Colo. 2001).

Here, the legislative intent is explicit. The statute of frauds provides that "*[n]otwithstanding any statutory . . . law to the contrary*," claims relating to oral credit agreements are barred. Colo. Rev. Stat. § 38-10-124(2). The statute of frauds is not, therefore, irreconcilable with the Consumer Protection Act or the unconscionable mortgage practices statute. The legislature has plainly announced that the statute of frauds prevails. There is nothing in the unconscionable mortgage practices statute or the Consumer Protection Act to overcome this express statement or to indicate that those laws were intended to be exceptions to the statute of frauds' bar. In the face of such a clear legislative declaration, I conclude that the statute of frauds controls and precludes claims under the unconscionable mortgage practices statute and the Consumer Protection Act when, as here, those claims are based on oral representations made while negotiating a credit agreement.

Secondarily, the Wagners urge that at least part of their statutory claims survive regardless of the statute of frauds or any oral representations. More specifically, they contend that it was "unconscionable" for Universal to consummate the refinance loan on less favorable terms, i.e., a higher interest rate, than the Wagners' then-existing home loans. Pls.' Resp. at 13, 15; *see also* Colo. Rev. Stat. § 38-40-105(d) (prohibiting "facilitat[ing] the consummation of a mortgage loan agreement that is unconscionable given the terms and circumstances of the transaction"). These terms are in writing and

10

therefore avoid the problems with the statute of frauds. However, this argument suffers from a separate problem. Essentially, the Wagners are contending that offering a refinance loan at an interest rate above that of a customer's existing loans is *per se* unconscionable. The Wagners cite no authority for such a sweeping proposition, and I find that it lacks merit. Providing a high interest loan is not, by itself, "shockingly unfair or unjust." Merriam-Webster's Collegiate Dictionary 1362 (11th ed. 2007) (defining "unconscionable" in the context of sales practices).

The Wagners also appear to argue that Ms. McKinney inflated the Wagners' income when preparing their mortgage application and in so doing ran afoul of the statute's prohibition on fraudulently preparing and presenting a "written statement . . . in support of an application for a mortgage loan." Colo. Rev. Stat. § 38-40-105(c). *See* Pls.' Resp. at 12-13. Under their theory, Ms. McKinney violated the statute when she prepared and presented the Wagners' falsified application to Universal. The problem with this theory is that the Wagners are not suing Ms. McKinney; they are suing Universal. It cannot be that Universal bears responsibility for violation of the statute when it was the one defrauded.

For all of these reasons, the Wagners' arguments concerning their statutory claims cannot stand. Those claims must be dismissed.

### b. Common Law Claims

As to the common law claims for negligent hiring and for negligent training and supervision, the Wagners argue that these are not the types of claims the statute of frauds was intended to protect. Pls.' Resp. at 15-17. The flaw in the Wagners' argument is that these two claims are tied directly to Ms. McKinney's alleged oral

11

statements about the refinance loan. The alleged misrepresentations are the gravamen of the claims; they are the source of the Wagners' injuries. The Wagners contend that had Ms. McKinney not been hired or had she been more properly supervised, she would not have been in a position to make the purported statements about the trust fund while negotiating the refinancing loan.

Colorado courts have held that, when a claim relates to an oral credit agreement, parties may not avoid the statute of frauds by invoking novel causes of action or creative theories of relief. *Schoen*, 15 P.3d at 1100 ("[T]he legislative history, the relevant case law, and public policy demonstrate the appropriateness of applying the statute broadly to bar suits based upon all oral promises to lend money . . . ."); *Hewitt v. Pitkin County Bank and Trust Co.*, 931 P.2d 456, 458-59 (Colo. App. 1995) (emphasis added) (holding that the statute of frauds is not "limited by its terms to contract claims or to those tort claims which seek the *enforcement* of a credit agreement," but instead "*any* tort claims *relating to* an oral credit agreement involving a principal amount exceeding $25,000 are barred by § 38-10-124"); *Univex Int'l, Inc. v. Orix Credit Alliance, Inc.*, 902 P.2d 877, 880 (Colo. App. 1995) ("Section 38-10-124 . . . bars any action or claim relating to a credit agreement, regardless of whether the action is based upon a breach of contract or on some other theory of recovery."), *aff'd*, 914 P.2d 1355 (Colo. 1996). The negligent hiring and supervision claims would not exist but for the alleged misrepresentations, and "the statute renders representations . . . in connection with credit agreements inoperative unless they are reduced to writing." *Norwest*, 886 P.2d at 302. Those claims fail as well.

### B. Negligence Claim

Unlike the claims discussed above, the Wagners' negligence claim does not clearly relate to Ms. McKinney's alleged oral statements. Rather, the negligence claim asserts that Universal's refinance loan contained less favorable terms and conditions than the Wagners' existing loans and that Universal should have advised the Wagners of this unfavorable change. Compl. ¶¶ 72-73. As this claim is based on the actual, documented loan extended to the Wagners, it is not barred by the statute of frauds. However, Universal argues that summary judgment on this claim is still proper because there is no legal duty for a lender to analyze existing loans and advise the applicant of the comparative merits between those loans and the proposed loan. Def.'s Mot. at 11-13; *see also University of Denver v. Whitlock*, 744 P.2d 54, 56 (Colo. 1987) ("A negligence claim must fail if based on circumstances for which the law imposes no duty of care upon the defendant for the benefit of the plaintiff.").

"Whether a particular defendant owes a legal duty to a particular plaintiff is a question of law." *Whitlock*, 744 P.2d at 57. The Wagners point to the duty outlined in the Restatement (Second) of Torts, which has been adopted by Colorado, that

> "[o]ne party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated
>
> ...
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect the disclosure of those facts."

13

*Bair v. Pub. Serv. Employees Credit Union*, 709 P.2d 961, 962 (Colo. App. 1985) (quoting Restatement (Second) of Torts, § 551(2) (1977)). However, there is no dispute that Universal disclosed "facts basic to the transaction." The Wagners admit that the loan documents accurately conveyed the loan's terms. Def.'s Mot., Ex. A at 195:5-199:6. The Wagners point to no law suggesting a lender has any additional duty to subjectively evaluate whether a refinance is a "good deal" or not. For this reason, the negligence claim must also be dismissed.

**IV. CONCLUSION**

The focus of the Wagners' case is on oral statements a dishonest agent of Universal purportedly made when negotiating an extension of credit. Given the breadth of Colorado's credit agreement statute of frauds, the claims relating to those statements cannot proceed. As to the remaining claim for negligence, Universal satisfied its duty by accurately disclosing the terms of the refinance loan it was offering. Accordingly, it is

ORDERED that Universal Financial Group, Inc.'s motion for summary judgment [Docket No. 19] is GRANTED. It is further

ORDERED that plaintiffs' claims against defendant are DISMISSED with prejudice.

DATED March 5, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge